

LODGED
CLERK, U.S. DISTRICT COURT
10/29/25
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ DEPUTY

ORIGINAL

1  BILAL A. ESSAYLI
   First Assistant United States Attorney
2  IAN V. YANNIELLO
   Assistant United States Attorney
3  Chief, National Security Division
   JOHN J. LULEJIAN (Cal. Bar No. 186783)
4  Assistant United States Attorney
        1200 United States Courthouse
5       312 North Spring Street
        Los Angeles, California 90012
6       Telephone: (213) 894-0721
        Facsimile: (213) 894-0141
7       E-mail:   John.Lulejian@usdoj.gov

8  Attorneys for Plaintiff
   UNITED STATES OF AMERICA

9

FILED
CLERK, U.S. DISTRICT COURT
10/29/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ___clee___ DEPUTY

10                UNITED STATES DISTRICT COURT

11            FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  IN THE MATTER OF THE            No. 2:25-mj-06751-DUTY
    EXTRADITION OF
13                                   COMPLAINT
14  GUY MIZRACHI,
                                     FOR PROVISIONAL ARREST WITH
15  A Fugitive from the             A VIEW TOWARD EXTRADITION
    Government of the               (18 U.S.C. § 3184); ORDER THEREON
16  Federal Republic of
    Germany.                        **(UNDER SEAL)**

17

18  TO:  Honorable Steve Kim
         United States Magistrate Judge
19       Central District of California

20       I, JOHN J. LULEJIAN, being duly sworn, depose and state that I

21  am an Assistant United States Attorney for the Central District of

22  California and act for the United States in fulfilling its

23  obligations to the Government of the Federal Republic of Germany

24  ("Germany") pursuant to the Treaty Between the United States of

25  America and the Federal Republic of Germany Concerning Extradition,

26  U.S.-F.R.G., June 20,1978, T.I.A.S. No. 9785, as amended by the

27  Supplementary Extradition Treaty with the Federal Republic of

28  Germany, U.S.-F.R.G., Oct. 21, 1986, S. Treaty Doc. No. 100-6 (1987),

1    as amended by the Second Supplementary Treaty to the Treaty Between

2    the United States of America and the Federal Republic of Germany

3    Concerning Extradition, U.S.-F.R.G., Apr. 18, 2006, S. Treaty Doc.

4    No. 109-14 (2006) (collectively, the "Treaty").

5        In accordance with Title 18, United States Code, Section 3184, I

6    charge on information and belief as follows:

7        1.    That the Government of Germany has requested the

8    provisional arrest of the fugitive, GUY MIZRACHI ("MIZRACHI" or the

9    "fugitive"), pending extradition, pursuant to Article 16 of the

10   Extradition Treaty, as amended by Article 3 and Article 4 of the

11   Second Supplementary Treaty.

12       2.    That according to the information provided by the

13   Government of Germany, MIZRACHI is wanted by Germany so that he may

14   be prosecuted for Formation of a Criminal Organization Abroad, in

15   violation of Section 129 paras. 1, 5 and 129b para. 1 of the German

16   Criminal Code.[1]

17       3.    That on or about May 13, 2025, the Koblenz District Court,

18   which is authorized by German law to issue warrants of arrest, issued

19   a warrant for MIZRACHI's arrest for this offense.  The warrant

20   remains valid and enforceable.

21       4.    That the offense for which the fugitive's extradition is

22   sought is covered by Article 2 of the Extradition Treaty.

23

24

25

26

_____

27       [1] The United States is seeking a warrant for MIZRACHI's
     provisional arrest based only on this charge, but doing so is without
     prejudice to proceeding on additional charges when Germany's formal
28   request for extradition has been reviewed by the Department of State
     and is presented to the Court.

1        5.      That German authorities allege that Germany has
2   jurisdiction over the offense MIZRACHI is accused of having
3   committed.

4        6.      That Germany's request contains information that was
5   developed during an extensive international investigation that
6   resulted in evidence in the form of banking and financial records,
7   business records, witness and victim statements, e-mail
8   communications, text messages via the messaging services WhatsApp and
9   Telegram, and other records.  Germany's case is also based on
10  evidence developed during the 2020 prosecutions of the late Hamid
11  "Ray" Akhavan ("R. Akhavan") and Ruben Weigand ("Weigand"), a current
12  co-defendant, for similar criminal conduct in the United States
13  District Court for the Southern District of New York, 1:20-cr-00188-
14  JBR (S.D.N.Y. 2020),[2] including the results of searches of two mobile
15  telephones and a laptop.  Germany presents the following facts, among
16  others, related to the above offense in support of its request for
17  the provisional arrest of MIZRACHI:

18           a.      Germany is prosecuting a global criminal organization,
19  which through separate but related networks, falsified subscriptions
20  to online "services" that were not provided, fraudulently charged
21  debit and credit cards for those nonexistent services through German
22  payment service providers, and distributed the wrongly charged money
23  to the participants in the global criminal organization.  One of the

24

25  _____

26      [2] See https://www.justice.gov/usao-sdny/pr/two-architects-
    fraudulent-scheme-sentenced-processing-over-150-million-through-us
    (R. Akhavan and Weigand sentenced following conviction of "scheme to
27  deceive U.S. issuing banks and credit unions into effectuating more
    than $150 million of credit and debit card purchases of marijuana by
28  disguising those transactions as purchases of other kinds of goods,
    such as face creams and dog products.")

3

1  networks, WebOps, created shell companies that purportedly operated
2  fictitious pornographic Internet websites and fraudulently registered
3  those companies with German payment service providers to facilitate
4  financial transactions between unsuspecting victims and the criminal
5  organization.  Between or about March 2016 and July 2021, the WebOps
6  network included the now-deceased R. Akhavan and the following
7  individuals believed to be residing in the United States:

8          i.    ARDESHIR SEYED AKHAVAN ("A. AKHAVAN");
9          ii.   TUNDE BENAK ("BENAK")
10         iii.  KATIUSKA CRUZ ("CRUZ");
11         iv.   MIZRACHI; and
12         v.    MEDHAT MOURID ("MOURID") (collectively the
13  "WebOps Members").  Other members of the WebOps network reside
14  outside of the United States.  The role of each of these individuals
15  in WebOps is described below.

16                  Overview of Criminal Conduct

17         b.    Germany alleges that the WebOps Members and other
18  participants in the criminal organization (collectively "the network"
19  or "the organization") deceived German banks into processing more
20  than € 195 million, and attempted to deceive German banks into
21  processing more than € 660 million in credit and debit card payments
22  for the purchase of "services" that the cardholders did not order and
23  for which they often were unaware they were being charged.  The
24  charges the customers faced were disguised as payments to phony
25  online merchants, including transactions that appeared to be for
26  pornographic and adult entertainment sites.  In furtherance of the
27  scheme, the network created fictitious offshore corporations that
28  operated fake adult entertainment websites.  The network then worked

with third-party payment service providers (the "German payment service providers") to onboard those corporations with the providers, thus allowing the companies to process debit and credit transactions through their websites.  The network convinced German payment service providers to honor fictitious charges that appeared to be legitimate charges for services rendered.

   c. German authorities determined that between or about March 2016 and July 2021, over 9.6 million subscriptions were improperly charged via the WebOps network:

    i. The network improperly charged victims' credit cards in almost 2 million transactions, thereby causing financial damage of over € 195 million.

    ii. In an additional 7.7 million instances, the WebOps network submitted fictitious subscriptions to the German payment service providers that did not result in charges to credit cards because the data used was either outdated or incorrect or the credit card limit was exhausted.  These attempted transactions would have yielded over € 660 million had they been successful.

Summary of the WebOps Scheme

   d. German authorities determined that the WebOps scheme to defraud consisted of the following components:

    i. First, the WebOps network used phishing and other methods to obtain credit card information to charge for subscriptions to adult entertainment and pornographic websites.  Specifically, the WebOps network appropriated credit card information and data from large phishing attacks in which cardholders clicked on banner ads, downloaded Internet games, or registered for sweepstakes and potential fake shops.  The WebOps network also purchased card data on

5

1  the Darknet and from leaks following ransomware attacks, where

2  hackers published or auctioned the stolen files on the Darknet.

3                ii.  Second, the WebOps network used shell companies

4  disguised as legitimate merchants.  The WebOps network was a part of

5  a complex group-like corporate structure consisting of many letterbox

6  companies in the United Kingdom, Cyprus, Luxembourg, Canada and the

7  United States[3], through which approximately 486 front companies

8  operated at least 1,066 Internet pages.  To appear legitimate, each

9  fictious merchant ran five to seven webpages suggesting that they

10  were involved in selling legitimate adult entertainment services.

11  However, these front companies were used to facilitate the processing

12  of charges for which no services were ever provided.[4]  The scheme

13  even involved fake traffic to those websites to make it appear to

14  payment providers and financial institutions that the websites had

15  real customers and were operating legitimate online businesses.

16  These websites could not be found using ordinary search engine such

17  as "Google" or "Bing."  Further, the pornographic content pages of

18  many of the websites were almost identical in terms of their design

19  and menu navigation.

20  _____

21       [3] An investigation of the fictitious merchants and their
    headquarters revealed that they had been set up in groups and that
22  their business addresses often led to single-family homes or referred
    to purely virtual offices.  An audit of a German payment service
23  provider revealed that that managers of these fictitious merchants
    were already at retirement age and could not describe the business
24  model or the financial background of the companies purportedly
    managed by them, underscoring that these managers were not actually
25  managing anything at the merchants.

26       [4] Quantum Solutions, Inc. ("Quantum"), a company with a business
    address in Calabasas, California, was the company through which the
27  shell company documentation was submitted to payment service
    providers.  According to its website, the company's business
28  activities included, among others, programming, internet traffic and
    hosting. The operators of the WebOps network operated under Quantum's
    corporate mantle.

6

1        iii. <u>Third</u>, the issuing banks allowed the fictitious

2   merchants to set up accounts to process credit and debit card

3   transactions.   After creating the fictitious merchant companies, the

4   WebOps network established Visa and MasterCard merchant processing

5   accounts with one or more offshore acquiring banks.   Despite being

6   based outside of Germany, many of the fictitious merchants purported

7   to maintained Germany-based customer service numbers, which lent them

8   legitimacy.

9        iv.   <u>Fourth</u>, relying on the issuing banks and

10  documents submitted by the phony merchants, German payment service

11  providers agreed to accepted credit card charges for the merchants.

12  The WebOps network would ensure that the merchants and their websites

13  were accepted as customers by the German payment service providers

14  and were onboarded for the settlement of credit card transactions.

15  Once the German payment service providers accepted the fictitious

16  merchants as customers, members of the network could collect the

17  unauthorized debits, in part by maintaining close contacts with high-

18  ranking employees of the German payment service providers.

19        e.   <u>Fifth</u>, fictitious merchants charged victims' credit

20  cards, mostly Visas and MasterCards.   Witnesses told German

21  authorities that their credit card data were improperly used to

22  subscribe to the use of pornographic material on the above websites

23  without the cardholders having used a service.   As a result, presumed

24  monthly subscriptions of up to € 50 were billed via these credit

25  cards, often over several years.   In many cases, the victims did not

26  notice that they had been harmed, as their credit card statements

27  contained only cryptic descriptors and did not reference the

28  corresponding websites.

1        f.   <u>Sixth</u>, credit card payments were funneled back to the

2  WebOps network, thereby laundering the proceeds of the credit and

3  debit card fraud.  All of the funds were funneled to <u>Five Lions</u>

4  <u>Holding Société à responsabilité limitée</u> ("Five Lions Holding"),

5  which, according to Luxembourg authorities, was a letterbox business

6  in that nation that did not conduct economic activity.  The German

7  investigation determined that WebOps was the "master merchant"-the

8  "operating arm" of Five Lions Holding.  As detailed below, between or

9  about March 2016 and July 2021, A. AKHAVAN and MIZRACHI operated

10  WebOps from the United States.

11                  <u>Structure of the WebOps Network</u>

12        g.   The network is similar to an internationally active

13  corporation.  The WebOps network built up a complex company structure

14  and a supposed franchise system called "CE Cash" under the leadership

15  of the late R. Akhavan, GUY MIZRACHI, and A. AKHAVAN.  In the WebOps

16  network, the franchisees were the fictitious merchants, and the

17  franchisors were the leaders of the network.  However, the CE Cash

18  franchise system was a façade.

19        h.   According to the notes of an employee of a German

20  payment service provider, in or about August 2018, R. Akhavan stated

21  during a personal meeting in Vienna, Austria, with an employee of

22  German payment processor <u>Wirecard Aktiengesellschaft</u> ("Wirecard"),

23  that he was behind CE Cash.  He described CE Cash as a group of

24  companies specialized in adult entertainment which, as franchisors,

25  offered licenses to companies in the adult entertainment industry.

26  CE Cash offered its customers-the franchisees-package solutions such

27  as web hosting, software, traffic processing, and customer support.

28  The franchisee paid 90 percent of its total turnover to the licensor

1  CE Cash, a practice that departed completely from the classic and
2  widespread franchise model, in which franchisees are economically
3  independent.  Under the terms of the contract, the fictitious
4  merchants received only a fixed € 5,000 per annum, an amount far
5  removed from their own revenue.  Instead, the entire revenue
6  generated by the fictitious merchants went to "the network managers"-
7  the WebOps Members and other members of the network.

8          i.    The German investigation also revealed that the
9  fictitious merchants' content design and orientation of the Internet
10  pages were not carried out by the merchants.  The fictitious
11  merchants also did not obtain their URLs.  Instead, these tasks were
12  handled by the WebOps Members.

The WebOps Members and Their Roles

14         j.    R. Akhavan:  Prior to his arrest in March 2020, R.
15  Akhavan operated the WebOps network and determined its illegal design
16  in commercial transactions.

17         k.    MIZRACHI:  Between or about 2016 and 2020, MIZRACHI
18  was R. Akhavans' right-hand lieutenant.  Following R. Akhavan's
19  arrest, MIZRACHI ran the WebOps network with R. Akhavan's brother, A.
20  AKHAVAN.  In or about October 2024, MIZRACHI took over sole
21  responsibility for running the WebOps network.

22         l.    A. AKHAVAN:  In addition to being R. Akhavan's
23  brother, between or about 2016 and 2021, A. AKHAVAN was the Director
24  of Marketing, and together with MIZRACHI, managed the WebOps network.

25         m.    MOURID:  MOURID was the Head of IT Services within the
26  WebOps network.  As a technical controller, MOURID allocated the URLs
27  for the fictitious merchants and created the content and design of
28  their webpages.

9

1          n.    CRUZ:  CRUZ was the Chief Procurement Officer of the

2   WebOps network, making the purchases necessary to maintain the

3   network and overseeing the entire procurement process.

4          o.    BENAK:  BENAK was the Head of the Reconciliation

5   Department, handling the accounting and reconciliation of accounts

6   for the whole WebOps network.

7                        Summary of Victim Testimony

8          p.    Given the enormous number of victims whose debit or

9   credit cards were fraudulently charged by the WebOps network, Germany

10  has provided summaries of statements from a sampling of victims from

11  across Europe.  Specifically, during their investigation, authorities

12  interviewed approximately 112 witnesses from Germany.  All these

13  witnesses stated that they had never subscribed to the WebOps

14  websites and had not used the services of the websites they had been

15  given.

16         q.    German authorities also interviewed over 200 witnesses

17  from Croatia, the Czech Republic, Estonia, Greece, Latvia, Poland and

18  Sweden.  Almost all the witnesses agreed that they had not subscribed

19  to the adult entertainment websites for which they were charged.

20  They confirmed to German authorities that they did not want or

21  willfully authorize the debits from their credit cards.  The

22  breakdown of those witnesses follows:

23         i.    Estonia:  Sixteen witnesses stated that they had

24  never used their credit cards to subscribe to the websites in

25  question, nor had they used the services of the websites.  Of these,

26  approximately 31 percent of the witnesses had previously entered

27  their credit card details on other dating and/or erotic sites and/or

28  gambling sites and had only wanted to subscribe there, not to the

                                    10

1  websites in question.  Seven of the 16 witnesses said they noticed
2  some or all the debits, and nine witnesses did not notice the debits.
3        ii.  Greece:  Eight witnesses stated that they have
4  never visited nor subscribed to the websites that charged their
5  cards.  Of these, approximately 29 percent of the witnesses had
6  previously entered their credit card details on other dating and/or
7  erotic sites and had only wanted to subscribe there – but not on the
8  websites that were being held.  Only one of the witnesses interviewed
9  noticed the debit on his credit card.
10        iii. Croatia:  Twenty-two witnesses stated that they
11  had never subscribed to websites with their credit cards or used the
12  services of the websites about which they were asked.  Of these,
13  approximately 47 percent of the witnesses had previously entered
14  their credit card details on other dating and/or erotic sites but did
15  not enter their information on the WebOps' websites.  Seven of the 16
16  witnesses stated that they noticed all or part of the debits, while
17  nine witnesses did not notice the debits.
18        iv.  Latvia:  Thirty-six witnesses stated that they
19  had not used nor subscribed to any of the websites using their credit
20  cards.  Of these, approximately 33 percent of the witnesses had
21  previously knowingly and intentionally entered their credit card data
22  on other dating and/or erotic and/or gaming and/or sweepstakes sites
23  but not on the internet sites that were the subject of Germany's
24  investigation.  Three quarters of the witnesses stated that they
25  noticed all or part of the debits, while the rest did not.
26        v.  Poland:  Forty-two witnesses stated that they had
27  never subscribed to the websites with their credit cards and had not
28  used the services of the websites.  Of these, approximately 29

1  percent of the witnesses had previously entered their credit card
2  details on other dating and/or erotic sites but did not knowingly or
3  intentionally enter such information on the websites in question.
4  Only 10 of the 43 witnesses stated that they noticed some or all of
5  the debits, and 32 witnesses had not noticed the debits at all.

6          vi.  Czech Republic:  Of the fifty-seven witnesses,
7  approximately 96.5 percent said that they never used their credit
8  cards to subscribe to the websites or otherwise used the services of
9  the websites.  Of these, approximately 61 percent of the witnesses
10  testified that they did not enter their credit card on the websites
11  with which they were presented, but they acknowledged that they had
12  registered or otherwise entered their credit card data on other
13  dating or erotic websites, as well as on gaming, betting,
14  sweepstakes, verification or ordering websites for computer software.
15  Only 27 witnesses said that they noticed some or all of the debits,
16  and 30 witnesses had not noticed the debits.

17          vii.  Sweden:  Twenty witnesses stated that they had
18  not used the services of the websites they had been given nor entered
19  their credit card information on the websites.  Of these,
20  approximately 55 percent of the witnesses had previously entered
21  their credit card details on other dating and/or erotic sites and/or
22  investment sites but not on the websites in question.  Only two of
23  the 20 witnesses stated that they noticed all or part of the debits,
24  and 18 witnesses had not noticed any of the debits.

25      7.    That in addition to the facts outlined above, Germany's
26  request presents the following facts, among others, related to
27  MIZRACHI's specific involvement in the criminal scheme and commission
28  of the above-referenced offense:

                                    12

a.    Between or about 2016 and 2020, MIZRACHI was the right-hand lieutenant of R. Akhavan.  As early as 2011, MIZRACHI was named by employees of German payment processor Wirecard as the second-in-command (after R. Akhavan) and whose instructions had to be followed.  Following R. Akhavan's arrest in 2020, MIZRACHI ran the WebOps network with R. Akhavan's brother A. AKHAVAN.  After R. Akhavan died in October 2024, MIZRACHI took over management of the WebOps network.

b.    MIZRACHI communicated with Weigand and others to coordinate the operational business of the WebOps network.  For example, he and Weigand discussed how to easily onboard the WebOps network in Europe with German payment service processors.  MIZRACHI announced new online retailers (fictitious merchants) to register, monitored the current processing status of business registrations and dealt with problems arising in connection with the rules of Visa or Mastercard.  MIZRACHI also approved contracts with third parties on behalf of online retailers (fictitious merchants).

c.    In addition, MIZRACHI communicated with the German payment service processors.  He determined which German payment processors the network should use, which documents the network should use to meet know-your-customer requirements of German payment processors that would demonstrate that the merchants charging the German payment processors were legitimate, and which fictitious website accounts the network should show to the German payment processors to establish legitimacy.  Telegram messages, dated on or about August 20, 2019, between MIZRACHI and Weigand reveal discussions about taking over the management of the WebOps network

13

from R. Akhavan and how to communicate with payment processors and transfer the network's funds:

| TIME | AUTHOR | MESSAGE |
|------|--------|---------|
| 07:43:38 (UTC+0) | MIZRACHI | Ray has been told that he is no longer active or owner of the companies. |
| 07:43:50 (UTC+0) | MIZRACHI | 5lions webops Quantum. Etc. |
| 07:44:12 (UTC+0) | MIZRACHI | He is of course threatening to kill all the banking activity. |
| 07:44:19 (UTC+0) | MIZRACHI | Affect the wires etc. |
| 07:45:00 (UTC+0) | MIZRACHI | In case he tries to contact B/S or Concardis [German service processors]. |
| 07:45:15 (UTC+0) | MIZRACHI | And says that he is UBO.[5] |
| 07:45:30 (UTC+0) | MIZRACHI | Move the money etc. |
| 07:46:03 (UTC+0) | MIZRACHI | The truth is we moved Ray's Shares from Ray to his asset Protection Trust. |
| 07:46:15 (UTC+0) | Weigand | Will give Mirko a heads up. |
| 07:46:24 (UTC+0) | MIZRACHI | To protect his businesses from lawsuits like Eaze etc...[6] |
| 07:46:50 (UTC+0) | MIZRACHI | So he is no longer in control "on paper". |

---

[5] "UBO" appears to be an abbreviation of "Ultimate Beneficial Owner," the real person who ultimately owns or controls a company, even if they are not listed as the official owner.

[6] R. Akhavan and Weigand were consultants for Eaze, a California cannabis delivery company that was the subject of R. Akhavan's and Weigand's prosecution in the Southern District of New York. See Jody Godoy, Ex-Eaze consultants sentenced to prison for pot payment scheme, Reuters (June 18, 2021), https://www.reuters.com/legal/government/ex-eaze-consultants-sentenced-prison-pot-payment-scheme-2021-06-18/.

| 07:47:22 (UTC+0) | MIZRACHI | Of 5Lions it is now some Cook Islands Trust. |
|---|---|---|
| 07:52:48 (UTC+0) | MIZRACHI | We may want to let Robert at Worldline know as well. |
| 07:53:01 (UTC+0) | MIZRACHI | The Story Is that Ray is no longer in control because he transferred his ownership to an asset protection trust in the Cook Islands. |
| 07:56:45 (UTC+0) | MIZRACHI | To protect his assets from creditor actions and issues arising out of certain relations like Eaze. |
| 07:57:18 (UTC+0) | MIZRACHI | We will get you the details for the trust and eventually we make the KYC[7] change with the Banks. |
| 07:57:59 (UTC+0) | MIZRACHI | For now let's try to keep it discreet not to make it about Ray and drugs etc. |
| 07:58:32 (UTC+0) | MIZRACHI | Our enemies will only use that against us. |
| 07:59:31 (UTC+0) | MIZRACHI | Of course with the people that are close to us we should be honest. |

d.    MIZRACHI is registered as Director Legal Affairs of Quantum, which as described above, was the company through which the shell company documentation was submitted to payment service processors.  Using this company, MIZRACHI and other WebOp Members conducted activities on behalf of the WebOps network, as evidenced by the following examples:

---

[7] "KYC" and "kyc" appear to be abbreviations for "know your customer," a mechanism that allows financial institutions to confirm the identity of parties with whom they transact business, ensuring that those parties are acting legally.

15

1            i.   On or about September 11, 2019, CRUZ, using a

2  Quantum e-mail address, informed Weigand and others that during her

3  vacation, "For any other questions or inquiries not pertaining to KYC

4  docs please email Guy directly at" his Quantum e-mail address.  In

5  addition, she wrote that as a "[q]uick rule of thumb . . . [¶]All KYC

6  docs issues or inquiries (such as utility bill, passport, signed docs

7  etc..) please email all of us (kim, eva, guy [presumably MIZRACHI],

8  and myself)."  In addition, she wrote that for "[a]ll other non kyc

9  issues please send director to guy [presumably MIZRACHI] with a cc to

10  me".

11            ii.  On or about June 27, 2018, MIZRACHI, using his

12  Quantum e-mail address, wrote to CRUZ, at her Quantum e-mail address,

13  and others, and described WebOps' role in the network:

> Most urgent is WebOps so we can use it as the Parent in the
> franchise to issue cards to the Merchant Companies and
> start charging for the inter merchant traffic exchange,
> where merchant display banner ads for each other and pay
> for this traffic on a credit card."
>
> Could you please push these as fast as possible to get us
> going?

19            e.   In addition, MIZRACHI's overarching responsibility was

20  to decide how to distribute the money from the various networks,

21  including WebOps.  According to the German investigation, the money

22  generated from the WebOps scheme went first to the German payment

23  service processors then indirectly to the fictitious merchants---all

24  at MIZRACHI's direction.  However, the funds were not transferred

25  directly to the bank accounts of the fictitious merchants.  Instead,

26  after collecting the funds at the bank accounts of the payment

27  service processors, the money flowed to pooling accounts where the

28

1  funds were collected by many different fictitious merchants, mixed
2  and then transferred to many other bank accounts.

3      8.   That U.S. law enforcement also believes that MIZRACHI may
4  be found within the jurisdiction of this Court.  According to the
5  United States Marshals Service:

6          a.   California Department of Motor Vehicles ("DMV")
7  records reveal that, on or about September 29, 2025, the DMV issued a
8  California driver's license (No. ****7086) to "Guy Mizrachi," which
9  lists his date of birth (**/**/1970), and an address in Agoura Hills,
10 California.  The month and year of birth correspond with the date of
11 birth the German authorities provided for MIZRACHI.  However, the day
12 of the month provided by the German authorities is different.
13 Nonetheless, the man depicted in the driver's license photograph,
14 taken on or about May 2, 2018, appears to be the same person depicted
15 in photographs of MIZRACHI Germany provided to the United States.

16         b.   Law enforcement records also reveal that on or about
17 October 10, 2023, MIZRACHI, using a U.S. passport (No. *****8036),
18 arrived in Los Angeles, California, by air from Vancouver, British
19 Columbia, Canada.

20     9.   That the Government of Germany has represented that it will
21 submit a formal request for extradition supported by the documents
22 specified in the Extradition Treaty, within the time required under
23 the Extradition Treaty.

24     10.  That MIZRACHI would be likely to flee if he learned of the
25 existence of a warrant for his arrest.

26     WHEREUPON, complainant respectfully requests that a warrant for
27 MIZRACHI's arrest be issued, based on probable cause, pursuant to
28 Title 18, United States Code, Section 3184, and the extradition

1  treaty between the United States and Germany, so that the fugitive

2  may be arrested and brought before this Court to the end that the

3  evidence of criminality may be heard and considered, and that this

4  complaint and the warrant be placed under the seal of the Court,

5  except as disclosure is needed for its execution, until such time as

6  the warrant is executed.

7  DATED: This 29th day of October, 2025, at Los Angeles, California.

8                              Respectfully submitted,

9                              BILAL A. ESSAYLI
                               First Assistant United States Attorney

10
                               IAN V. YANNIELLO
11                             Assistant United States Attorney
                               Chief, National Security Division
12

13

14                             JOHN J. LULEJIAN
                               Assistant United States Attorney
15
                               Attorneys for Complainant
16                             UNITED STATES OF AMERICA

17  Subscribed and sworn to by
    the applicant on this 29th
18  day of October, 2025.

19

20

21  HONORABLE STEVE KIM
    UNITED STATES MAGISTRATE JUDGE
22

23

24

25

26

27

28